1  Derek A. Newman, State Bar No. 190467
   *dn@newmanlaw.com*
2  Sophy J. Tabandeh, State Bar No. 287583
   *sophy@newmanlaw.com*
3  NEWMAN DU WORS LLP
4  100 Wilshire Boulevard, Suite 940
   Santa Monica, CA  90401
5  Telephone:  (310) 359-8200
   Facsimile:   (310) 359-8190
6

7  John Du Wors, State Bar No. 233913
   *john@newmanlaw.com*
8  Derek Linke (admitted *pro hac vice*)
   *linke@newmanlaw.com*
9  NEWMAN DU WORS LLP
10 2101 Fourth Avenue, Suite 1500
   Seattle, WA  98121
11 Telephone:  (206) 274-2800
   Facsimile:   (206) 274-2801
12

13 Attorneys for Plaintiff
   Essociate, Inc.

14

15            **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
16               **SOUTHERN DIVISION**

17 ESSOCIATE, INC., a Delaware          Case No. SACV12-00831-JVS (MLGx)
   corporation,
18                                      **MEMORANDUM OF POINTS**
                                        **AND AUTHORITIES IN**
19            Plaintiff,                **SUPPORT OF PLAINTIFF**
                                        **ESSOCIATE, INC.'S**
20       v.                             **APPLICATION FOR DEFAULT**
                                        **JUDGMENT AGAINST**
21 EAGLE WEB ASSETS, INC., an           **DEFENDANTS EAGLE WEB**
   Illinois corporation; and EWA        **ASSETS, INC. AND EWA**
22 NETWORK, INC., an Illinois           **NETWORK, INC.**
   corporation,
23

24            Defendants.               Date:        February 23, 2015
                                        Time:        1:30 p.m.
25                                      Courtroom:   10C

26                                      The Honorable James V. Selna
                                        Santa Ana Courthouse
27

28

# I.    Introduction

Defendants Eagle Web Assets, Inc. and EWA Network, Inc. (together, "Eagle") generated over $100 million in gross revenue operating an online affiliate-network system that infringed business competitor Plaintiff Essociate, Inc.'s U.S. Patent No. 6,804,660 (the '660 Patent). Eagle now appears to have ceased business and is in default in this action, having withdrawn after multiple notices from Eagle's former counsel of record and Essociate.

Under 35 U.S.C. § 284, Essociate is entitled to receive, at a minimum, a reasonable royalty for Eagle's infringement. Essociate seeks the entry of a default judgment awarding a reasonable royalty of $1,004,001.67, which is 5 percent of Eagle's gross profit from operation of its infringing online affiliate network. Essociate also requests that the judgment include costs, as provided by 35 U.S.C. § 284, and post-judgment interest.

# II.    Facts

## A.    Eagle operated an online affiliate system that infringed Essociate's patent in the field of online affiliate marketing.

Essociate's '660 Patent claims a novel "System, Method, and Article of Manufacture for Internet Based Affiliate Pooling" in the field of online affiliate marketing. (Complaint for Patent Infringement (Complaint) (Dkt. 1) ¶ 5, Exh. 1.) The invention disclosed in the '660 Patent permits an online affiliate-marketing network to practice a more scalable and efficient form of affiliate marketing than taught by the prior art. (*Id.*)

Essociate and Eagle are business competitors in the field of online advertising. (*See, generally,* Complaint; January 9, 2015 Declaration of Michael Landau in Support of Application for Default Judgment (Landau Decl.) ¶ 2.) Both companies offer—or offered, in Eagle's case—an Internet-based affiliate network for website operators who want to display advertisements on their sites. (*Id.* ¶ 3.)

2
MEMO. OF P. & A. IN SUPP. APP. FOR DEFAULT J.

1       Essociate's principals developed and patented a novel method and system by

2   which webmasters in affiliate systems like Essociate's or Eagle's to have access to

3   offers available in a merchant's affiliate system without having to join the

4   merchant's affiliate system. (*Id.* ¶ 4; Complaint at Exh. 1.) Eagle operated an online

5   affiliate system, the EWA Private Network affiliate marketing network, that

6   practiced this technology without a license, thus infringing the '660 Patent.

7   (Complaint ¶¶ 11–16.)

8

9   **B.   Eagle appeared by counsel, answered Essociate's Complaint, but**
    **then Eagle's counsel withdrew, its answer was stricken, and it**
10  **was entered into default.**

11      On May 23, 2012, Essociate filed its Complaint (Dkt. 1) alleging that Eagle

12  infringed the '660 Patent. On July 31, 2012, Eagle filed an answer to the Complaint.

13  (Dkt. 11.)

14      On May 22, 2013, Eagle's counsel moved to withdraw as counsel on the

15  grounds that Eagle failed to communicate with them, making it impossible for

16  Eagle's counsel to effectively represent it in this action. (Dkt. 36.) On June 20,

17  2013, this Court entered an order granting Eagle's counsel's motion to withdraw,

18  and requiring Eagle to identify new counsel before August 12, 2013. (Dkt. No. 41.)

19  Eagle Web did not identify new counsel, and on August 12, 2013, the Court held a

20  status conference and ruled that Essociate could file a motion to strike Eagle's

21  answer. (Dkt. 45.)

22      On September 24, 2013, Essociate filed its motion to strike Eagle's answer.

23  (Dkt. 46.) On October 24, 2013, the Court entered an order striking Eagle's

24  answer. (Dkt. 48.) Essociate requested entry of default against Eagle, which was

25  entered on May 1, 2014. (Dkt. 64.)

26

27

28

MEMO. OF P. & A. IN SUPP. APP. FOR DEFAULT J.

**C.    Essociate obtained Eagle's business records via third-party discovery to a software and services provider Eagle used to operate its infringing system.**

In addition to the evidence in the Complaint, Essociate's principals are the '660 Patent's inventors and operate a similar affiliate-marketing system to Eagle's. (Landau Decl. ¶ 6.) Essociate's principals reviewed and were familiar with Eagle's online affiliate system when it was operating, and reviewed Eagle's business records produced by third-party Linktrust Systems in response to Essociate's subpoena. (*Id.* ¶ 7.)

Eagle's affiliate system offered advertisements to Eagle's affiliates—webmasters who could post advertisements on webpages and other sites on the Internet. (*Id.* ¶ 8; Complaint ¶¶ 12–15.) These affiliates then posted the advertisements on the Internet, and Internet users viewing the webpages clicked on the advertisements and were directed to a merchant's website. (Landau Decl. ¶ 9.)

LinkTrust's records for Eagle's online affiliate system show Eagle's revenue received from merchants for advertising offers provided by Eagle to Eagle's affiliates, Eagle's commission payments to affiliates, and Eagle's gross profit after deducting those payments. (*Id.* ¶ 10.) According to those records, the total revenue received by Eagle for the advertisements was $135,888,340.16. (*Id.* ¶ 11.) The total commissions due to Eagle's affiliates totaled $115,808,306.83, leaving Eagle with $20,080,033.33 in gross profit. (*Id.*)

**D.    Overhead expenses are low in affiliate marketing.**

Affiliate marketing systems like Essociate and Eagle's require very little overhead in terms of physical equipment. (Landau Decl. ¶ 12.) Computer servers, Internet access, and computer access terminals are all that is required; affiliate businesses can be operated from anywhere in the world, and no offices or other brick-and-mortar locations are required. (*Id.* ¶ 13.) And in mid-sized operations like Essociate's and Eagle's, salaries are often paid principally to the business's founders and owners and are thus actually a measure of profit. (*Id.* ¶ 14.)

MEMO. OF P. & A. IN SUPP. APP. FOR DEFAULT J.

**E.    Essociate's royalty program ranges from 3–5 percent of gross profits from infringing activity for similarly-sized businesses.**

The '660 Patent issued in 2004. (*See* Complaint, Att. A.) Since that date, Essociate has established a licensing program that allows Essociate's competitors to practice the system and method claimed by paying a percentage of gross revenues to Essociate. (Landau Decl. ¶ 15.) For affiliate networks of approximately the same size as Eagle, Essociate generally receives between 3–5 percent of gross revenues as of that date unless a licensee demonstrates substantial hardship or some other factor justifying a lower rate. (*Id.* ¶¶ 17–18.) Essociate has also negotiated higher effective rates with some infringing competitors. (*Id.* ¶ 19.)

Essociate bases its royalty rate on gross profits because in the online affiliate network marketing industry, it is typical for licenses, royalties, or commissions to be based on gross revenues or gross profits. (*Id.* ¶ 20.) This is because in the online affiliate-network marketing industry, fraud is a major concern and it can be very difficult or impossible to verify or even monitor other parties' information and finances, including any purported costs or expenses which might be asserted if the base was net profits instead of gross. (*Id.* ¶ 21.)

### III.    Discussion

**A.    Default judgment against Eagle is reasonable and appropriate.**

In determining whether to grant a default judgment, courts consider: (1) the possibility of prejudice; (2) the merits of the claims; (3) the sufficiency of the complaint; (4) the money at stake; (5) the possibility of a dispute concerning material facts; (6) whether default was due to excusable neglect; and (7) the policy favoring decision on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986). "[T]he factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes v. United Fin. Group*, 559 F. 2d 557, 560 (9th Cir. 1977).

1.   **Prejudice will result to Essociate if judgment is not entered.**

Essociate served Eagle with the Summons and Complaint on May 29, 2012. (*See* Dkts. 60, 62.) Eagle's previous answer was stricken and it was entered into default by the Clerk on May 1, 2014. (Dkts. 48, 64.) Eagle's failure to defend this action denies Essociate the right to judicial resolution of the claims presented.

2.   **The Complaint alleges a meritorious claim.**

To prevail on a patent infringement claim, Essociate must prove that Eagle (1) without authority (2) makes, uses, offers to sell, sells, or imports (3) the patented invention (4) within the United States, its territories, or its possessions (5) during the term of the patent. 35 U.S.C. § 271(a); *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381 (Fed. Cir. 1996). The Complaint is presumed to be true and alleges each of these elements. (Dkt. 1.)

3.   **The amount of money at stake is proportionate to Eagle's misconduct.**

Essociate seeks a 5-percent royalty rate on Eagle's gross profits from operation of its infringing online affiliate network. This amount is proportionate to Eagle's misconduct because it is directly tied to the extent of Eagle's infringement and Eagle's benefits therefrom, as shown on Eagle's business records produced by Linktrust.

4.   **A dispute concerning material facts is highly unlikely.**

Once the Clerk entered default, Essociate's well-pleaded factual allegations are taken as true. *Geddes*, 559 F.2d at 560. Given the sufficiency of the Complaint, no genuine dispute of material facts would preclude granting Essociate's motion.

5.   **Eagle's default was not due to excusable neglect.**

After being properly served with the Summons and Complaint in May 2013,

MEMO. OF P. & A. IN SUPP. APP. FOR DEFAULT J.

1   Eagle's counsel withdrew because Eagle stopped responding to its counsel's

2   communications, making it impossible for its counsel to continue representation.

3   (*See* May 22, 2013 Declaration of J. Gregory Dyer (Dkt. 36-1).) In light of the

4   multiple notices sent to Eagle by its former counsel and Essociate regarding the

5   lawsuit, and the period of time that has elapsed, the possibility of excusable neglect

6   by Eagle is remote.

7

8       **6.    Policy does not preclude entry of default judgment.**

9       Although cases should be decided on the merits whenever reasonably possible,

10  courts have recognized that, "the mere existence of [Rule 55(b)] indicates that this

11  preference, standing alone, is not dispositive." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238

12  F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).

13

    **B.   Essociate is entitled to recover a reasonable royalty for Eagle's**
14       **infringement.**

15      Under 35 U.S.C. § 284, a patentee's remedy for infringement is "damages

16  adequate to compensate for the infringement, but in no event less than a reasonable

17  royalty for the use made of the invention by the infringer, together with interest and

18  costs as fixed by the court."

19      A reasonable royalty is one that would be reached in a hypothetical

20  negotiation, often calculated utilizing the fifteen factors enunciated in *Georgia-Pac.*

21  *Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) modified sub

22  nom. *Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d

23  Cir. 1971). The court has broad discretion to award damages, and Essociate need

24  not prove them with scientific certainty. *State Indus., Inc. v. Mor-Flo Indus., Inc.*,

25  883 F.2d 1573, 1576-77 (Fed. Cir. 1989).

26      The relevant *Georgia-Pacific* factors support a reasonable royalty of 5 percent

27  of Eagle's gross profits, or $1,004,001.67:

28

MEMO. OF P. & A. IN SUPP. APP. FOR DEFAULT J.

1.  The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2.  The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3.  The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4.  The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

Essociate aggressively defends its intellectual property rights, and has an established enforcement and licensing program. (Landau Decl. ¶ 15.) Essociate has granted numerous licenses or covenants not to sue, most but not all in the litigation context. (*Id.* ¶ 16.) Because the online affiliate-networking industry is worldwide and has a large number of competitors, Essociate has granted non-exclusive, non-restricted licenses. (*Id.* ¶ 16.) Effective royalty rates have generally varied from between 3–5 percent of gross profits (*i.e.* gross revenues less affiliate commissions) for comparably sized infringing affiliate networks to Eagle. (*Id.* ¶ 17.) Essociate considers the scope of infringement, ability of the licensee to pay, and litigation posture when evaluating acceptable royalty rates. (*Id.* ¶ 18.)

5.  The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

Essociate and Eagle were direct competitors, supporting a higher royalty rate.

6.  The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

7.  The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

8

MEMO. OF P. & A. IN SUPP. APP. FOR DEFAULT J.

8. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

9. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

Eagle's online-affiliate-network business was built around use of the '660 Patent's system and method. If Eagle offered services aside from its online affiliate network, neither those services nor any resulting revenue is reflected in the reports from LinkTrust. (Landau Decl. ¶ 10.)

10. The duration of the patent and the term of the license.

The '660 Patent issued on October 12, 2004, so the damages period would encompass all of Eagle's infringing activity to date but not any future infringement.

11. The established profitability of the product made under the patent; its commercial success; and its current popularity.

Online affiliate networks like Essociate and Eagle are part of a multi-billion dollar industry, and affiliate marketing systems like Eagle's are dependent on the '660 Patent's system and method. (Landau Decl. ¶ 19.)

12. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

13. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

The '660 Patent claims a method and system for permitting an affiliate in one affiliate system to have access to offers available in a merchant's affiliate system without having to join the merchant's system. (Landau Decl. ¶ 4; Complaint, Att. A.) This means that an affiliate of an online affiliate system practicing the patent

MEMO. OF P. & A. IN SUPP. APP. FOR DEFAULT J.

1   invention can have access to advertisements from a variety of merchants, without

2   having to participate in each merchant's own affiliate system. (*Id.* ¶ 5.) Prior art

3   required each affiliate to individually sign up for each merchant's affiliate network

4   and maintain those multiple relationships, a cumbersome and time-consuming

5   process. (*Id.* ¶ 6.) So an online affiliate network like Eagle which practiced the

6   invention claimed in the '660 Patent benefits by being able to offer a wider variety

7   of merchant's offers to its affiliates, thus providing more value to affiliates. (*Id.*

8   ¶ 7.)

9          14. The amount that a licensor and a licensee would have agreed
              upon (at the time the infringement began) if both had been
10             reasonably and voluntarily trying to reach an agreement.

11         This factor requires the Court to hypothesize about what Eagle and Essociate

12   would have agreed to had they negotiated before Eagle started infringing. *Viasat,*

13   *Inc. v. Space Sys./Loral, Inc.*, 3:12-CV-00260-H WVG, 2014 WL 3896073 (S.D. Cal.

14   Aug. 8, 2014). Essociate's proposed damages are commensurate with royalties in

15   the industry. The royalty rate is 5 percent of Eagle's gross profits—*i.e.* Eagle's

16   gross revenues less commissions due to Eagle's affiliates. Expenses other than

17   affiliate-commission payments are low in the online affiliate networking industry,

18   meaning that Eagle would have retained most of its gross profits. A 5-percent

19   royalty rate leaves Eagle competitive but does not give Eagle an unfair competitive

20   advantage against others in the industry which pay similar royalty rates.

21   **C.   Essociate is entitled to costs.**

22         Under 35 U.S.C. § 284, "upon finding for the [patent-infringement] claimant,

23   the court shall award the claimant damages… together with interest and costs."

24   Accordingly, Essociate is entitled to recover the costs incurred in litigating this

25   action. Essociate will submit a bill of costs within fourteen (14) days of entry of

26   judgment pursuant to Local Rule 54-2.1.

27

28

**D.    Essociate is entitled to post-judgment interest.**

Post-judgment interest is mandatory under 28 U.S.C. § 1961, which provides that "interest shall be allowed on any money judgment in a civil case recovered in a district court." Accordingly, Essociate is entitled to post-judgment interest in this matter, which is to be calculated in the manner provided by 28 U.S.C. § 1961(a).

## IV.    Conclusion

Default judgment should be entered in Essociate's favor and against Eagle in the amount of $1,004,001.67 in reasonable-royalty damages, along with an award of costs.

Dated: January 9, 2015.                    Respectfully Submitted,

Newman Du Wors LLP

By:    s/ Derek Linke
Derek A. Newman, State Bar No. 190467
*derek@newmanlaw.com*
Derek Linke, admitted *pro hac vice*
*linke@newmanlaw.com*
John Du Wors, State Bar No. 233913
*john@newmanlaw.com*
Sophy J. Tabandeh, State Bar No. 287583
*sophy@newmanlaw.com*

Attorneys for Plaintiff
Essociate, Inc.

MEMO. OF P. & A. IN SUPP. APP. FOR DEFAULT J.